Daniel M. Gilleon (SBN 195200)
Gilleon Law Firm, APC
1320 Columbia Street, Suite 200
San Diego, CA 92101
Email: dan@gilleon.com
Tel: 619.702.8623/Fax: 619.702.6337

Attorney for Plaintiff Henrique Lavalle Da Silva Faria

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRIQUE LAVALLE DA SILVA FARIA,<br><br>        Plaintiff,<br><br>   vs.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Defendant. | CASE NO.: _____<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **Breach of Express Agreement;**<br>2. **Breach of Implied Agreement;**<br>3. **Negligence;**<br>4. **Negligent Misrepresentation;**<br>5. **Negligent Interference with Prospective Contractual Relationships; and**<br>6. **Injunctive Relief.** |

Henrique Lavalle Da Silva Faria (Faria) brings this action on behalf of himself and alleges as follows:

## NATURE OF THE ACTION

1.    As a young lawyer, Henrique Faria's love for the law and resolve to master it propelled his career to impressive heights in Brazil during the first nine years of his practice. Along the way, he became aware that a more challenging and professionally rewarding practice existed in the international law arena, but this practice was beyond his reach unless he deepened his understanding of international and comparative law. To that end, he studied the websites of several elite law schools in the U.S. to find the one that would best serve his goals and fit within his means.

2.      Based on the representations, statements and promises of Defendant Regents of the University of California (Defendant or Regents), Faria chose the LL.M. program at U.C. school of Law at Berkeley (Berkeley Law) to expand and deepen his understanding of international and comparative law.

3.      Faria brought the same commitment to master the law to his studies as an LL.M. candidate at Berkeley Law. After his extraordinary performance at Berkeley Law and overcoming the long odds against him, he won his dream job as a Senior Advisor in the International Tax Services Practice at one of the world's Big Four Accounting Firms with enormous potential for future career growth.

4.      Shortly before he was to start work, he rented and furnished an apartment in New York City, while he waited for the U.S. Citizenship and Immigration Services (USCIS) to issue his authorization to remain in the U.S. to work over the next year.

5.      USCIS should have routinely approved Faria's work authorization, since he met all the requirements for one year of Optional Practical Training work authorization: he had completed his one year LLM program, had maintained student status throughout his stay, and had submitted the required I-20 issued by Defendant together with the USCIS form I-765 and proper filing fee. Berkeley claimed to have a highly skilled office and staff dedicated to preparing the necessary forms and processing those forms through USCIS.  Faria paid U.C. more than $60,000 in tuition and fees to provide him with the course work to get his LL.M. degree, to guide him through the career process, and to process Faria's application for work authorization with USCIS in compliance with federal statutes and regulations.

6.      But Defendant got it terribly wrong with catastrophic consequences for Faria. Through its Berkeley International Office (BIO), Defendant initiated a process with the USCIS that set the deadline for Faria to file his application with USCIS on May 6, 2018, while the same U.C. office gave Faria a completed form to be filed with the USCIS, which, according UC's instructions, set the deadline for May 9, 2018. Consequently, Faria's application arrived two days late at USCIS which caused USCIS to deny it.

/ / /

7.      Defendant could have easily detected its error at any time over the next four months and could then have acted to mitigate or avoid the damages and harm it was causing Faria. As a consequence of Defendant's wrongful conduct and breach of its agreement with Faria, Faria lost his dream job, his right to remain in the U.S. to work, and the growth of his career to the next level of international and comparative law practice. As the Defendant has refused to take any action to mitigate the harm it continues to inflict on Faria, his only recourse option is to seek judicial relief by filing this complaint with the Court.

8.      As alleged below in greater detail, Defendant through its sub-entities and agents has admitted its wrongful conduct and the harm that conduct would likely inflict on Faria's career and his reputation.

## PARTIES, JURISDICTION AND VENUE

9.      Faria is a citizen of the Federative Republic of Brazil. During the academic year of 2017-2018, Faria was a student at Berkeley Law enrolled in its LL.M. program.

10.      Defendant Regents of the University of California is a corporation charged by law with the duty of administering the University of California (U.C.) as a public trust, pursuant to Section 9 of Article IX of the California Constitution. In that capacity, Defendant is a citizen of the State of California and the United States.

11.      The matter in controversy exceeds the sum of $75,000.

12.      At all times relevant hereto, Defendant acted by and through Berkeley School of Law (Berkeley Law), the Berkeley International Office (BIO), Berkeley Advanced Degree Programs (ADP) Office, Career and Professional Development Services Office, the Office of Student Services and its servants, agents, and employees who acted within the scope of their authority.

13.      Venue is proper in this Court because Defendant (1) entered into the agreement alleged herein in Alameda County, agreed to perform the agreement in Alameda County, and breached the agreement in Alameda County and (2) committed the wrongful acts alleged herein in Alameda County.

/ / /

## U.C. BERKELEY REINVENTS ITSELF AS "VENTURE CAPITAL UNIVERSITY"

14.   When the State of California (California) enacted the Government Claims Act in 1963, U.C. was a tuition-free university for California residents and required a small tuition ($300 per year) for nonresident students. At that time, California and the U.S. Government (U.S.) paid more than 80 percent of U.C.'s operational budget[1] and raised those funds by imposing taxes on their citizens and residents. In this way, taxpayers funded U.C. operations when the Government Claims Act was enacted.

15.   By November 2016, when Faria applied for the LL.M. program at Berkeley Law, California and the U.S. had cut their collective funding of U.C. operations to 15 percent of the U.C. budget and 13 percent of the Berkeley Law budget.

16.   To offset decreasing government funding, Defendant has planned and striven to increase revenues from alternative sources including business and quasi business activities. As an element of that plan, Defendant has sought to restructure Berkeley Law into a financially self-supportive entity or even a profit center. In pursuing that goal, Defendant and Berkeley Law created Startup@BerkeleyLaw in 2015 as part of the U.C. "innovation ecosystem" to generate revenues by acting as an incubator and accelerator for high technology startups.[2]

17.   To enhance Startup@BerkeleyLaw's capacity to operate as a revenue generator, Defendant and Berkeley Law have created numerous affiliations and partnerships for Startup@BerkeleyLaw within Berkeley Law, the U.C. campus, the financial industry, and the professional firms that service the financial industry, including the following:

A.   Startup@BerkeleyLaw is itself a joint venture and collaboration between the Berkeley Center for Law and Business and the Berkeley Center for Law and Technology;

B.   Startup@BerkeleyLaw has formed relationships with other U.C. departments, schools, and offices such as the business and engineering schools, which it describes as its "campus partners";

---

[1]
https://cshe.berkeley.edu/sites/default/files/publications/douglassbleemer.tipping_point_report.updated_2.19.19.pdf.
[2] https://www.law.berkeley.edu/experiential/startupberkeleylaw/.
[2] https://www.law.berkeley.edu/experiential/startupberkeleylaw/.

C.  Startup@BerkeleyLaw has formed relationships with large law firms that represent financial institutions, public companies, and startups which it describes as its "legal partners";

D.  Startup@BerkeleyLaw has formed relationships with hedge funds, private equity funds, and venture capital investors which it describes as its "venture partners";

18.  Startup@BerkeleyLaw has formed a relationship with The National Venture Capital Association to create VC University, which brings together investors, startups, U.C. teaching staff, hedge funds, and private equity firms.[3]

## REGENTS PRIVATIZES EDUCATION WITH SELF-SUPPORTING PROGRAMS

19.  Defendant has created and uses Self-Supporting Graduate Professional Degree Programs (Self-Supporting Programs) as another profit center to offset its reduced funding from government sources.[4]

20.  Faria is informed and believes and thereon alleges that Defendant allocates no state or federal funding for the operations of the Self-Supporting Programs.

21.  Faria is further informed and believes and thereon alleges that Defendant has delinked its costs for operating the Self-Supporting Programs from the funds it seeks to generate from them, except the tuition paid by the student must equal or exceed the per-student cost of the program to Defendant.

22.  Faria is further informed and believes and thereon alleges that Defendant sets the tuition for some or all Self-Supporting Programs at whatever price the domestic or international market will bear. For those with little market demand, e.g., Master of Conservation and Restoration Science, Defendant sets the tuition as low as $23,000 per year. For those where the market demand is stronger, such as a Master of Health Science for a physician assistant, Defendant sets the tuition at $123,000 per year. Defendant sets the annual tuition for a nonresident medical student, which is not a Self-Supporting Program, at approximately $20,000 per year.[5] For these reasons, the Self-Supporting Programs have become U.C.'s cash cows,

---

[3] https://venturecapitaluniversity.com/.
[4] https://www.ucop.edu/institutional-research-academic-planning/_files/SSDPDP%20Policy_7.12.2016.pdf.
[5] https://registrar.berkeley.edu/tuition-fees-residency/tuition-fees/fee-schedule.

generating more than $1 billion per year and increases exponentially each year.

23.     One such "Self-Supporting Graduate Degree Program" is Berkeley Law's LL.M. program, in which Faria enrolled as a student in 2017.  Faria's costs for tuition and U.C. fees for his LL.M. and pre-LL.M. studies at U.C. were over $60,000 and, with living expenses, his total costs exceeded $90,000. By comparison, the tuition and fees for one year in the J.D. program at Berkeley Law for a nonresident student were approximately $27,000.[6]

## FARIA PAUSES HIS CAREER TO SEEK AN LL.M. AT BERKELEY LAW

24.     At the time Faria applied for admission to Berkeley Law's LL.M. program, he already had a successful nine-year career as an attorney in Brazil. After an internship at the public defender's office, he began his career as an attorney in the commercial and tax law practice area where he was given ever increasing responsibilities by the law firms that employed him. By 2017, when he applied for the LL.M. program, he had successfully litigated a $6.5 billion tax liability involving law from multiple nations, routinely advised clients such as Petrobras, a company with $100 billion market capitalization, on major tax matters, and opened a satellite office of his law firm as the resident attorney.

25.     By late 2016, Faria realized he would need to strengthen his knowledge of international and comparative corporate and business law for his career to continue its ascent. Knowing that elite U.S. law schools were ranked among the best in the world in these fields of law, Faria applied for admission to the LL.M. programs at several U.S. law schools, including Berkeley Law.

26.     In late 2016 and early 2017, when Faria was considering his educational options, the Berkeley Law website stated internationally known experts taught its LL.M. program and its LL.M. would provide him with the opportunity to obtain the specialized tools he would need for his career to continue its ascent. In particular, the Berkeley Law website told Faria and other prospective LL.M. candidates:

---

[6] https://www.ucop.edu/institutional-research-academic-planning/_files/SummaryofProposed_2016-17_SSGPDPFees_Attachment_1-6-09-16.pdf.

*Faria v. The Regents*, Case No.
Complaint for Damages - 6

**WHY CHOOSE BERKELEY LAW?**

**A top-tier education**. Berkeley Law is ranked among the top law schools in the world, offering a superb education in both established and emerging fields of law. **World-renowned faculty**. Our professors are internationally recognized experts in a variety of legal fields, including business law, IP law and social justice.[7]

27.     Faria applied to Berkeley Law for admission to the traditional track of the LL.M. program in November 2016. At that time, Berkeley Law's website informed LL.M. applicants that this track provided students with a range of opportunities and that candidates could select their law courses as they saw fit:

The traditional track of our LL.M. program… provides students with a range of opportunities, from obtaining a basic knowledge of the U.S. legal system to undertaking original research on a particular aspect of law.  Designed to integrate American and international law students at various levels of study, the traditional track allows candidates to satisfy degree requirements by enrolling in courses and seminars from among those offered to law students pursuing the J.D. degree. Aside from a few core curriculum courses specifically designed for international students, LL.M. candidates may select law courses as they see fit, with the exception of a few that are restricted to the J.D. curriculum.[8]

28.     In the 2016-2017 period, the Berkeley Law website had a Career Development page where it gave instructions and guidance to LL.M. students how to navigate through the maze of career opportunities to find the path best suited for them.[9]

29.     Through the Career Development page (Exhibit 3), Defendant and Berkeley Law told Faria and other LL.M. applicants that the Advanced Degree Programs (ADP) Office at Berkeley Law employed two skilled attorneys who had worked for elite international law firms. According to Defendant's and Berkeley Law's Career Development page, these attorneys would assist and guide LL.M. students in navigating their professional development and academic pursuits. Among other statements, the Career Development page told LL.M. applicants: "We can

---

[7] A true and correct copy of Berkeley Law's LL.M. website page in May 2016 is attached hereto an incorporated by reference as Exhibit 1.

[8] A true and correct copy of Berkeley Law's LL.M. traditional track website page in January 2017 is attached hereto an incorporated by reference as Exhibit 2.

[9] A true and correct copy of Berkeley Law's LL.M. Programs, Career Development website page in 2016-2017 is attached hereto an incorporated by reference as Exhibit 3.

help you explore a variety of legal career options—both traditional and nontraditional—and determine how to pursue them." Exhibit 3.

30.     The Career Development page also informed Faria that Berkeley Law's Career Development staff would provide instruction and guidance on the following:

**INDIVIDUAL COUNSELING**
ADP [Advanced Degree Programs] staffs two attorney-counselors dedicated to the professional development needs of LL.M. students. Each counselor has practiced law and can offer real-world insights into various career paths. You may sign up for individual appointments via bCourses.[10]

**TARGETED CAREER PLANNING**
We can help you explore a variety of legal career options—both traditional and nontraditional—and determine how to pursue them.
Your career planning will have two elements:
- Exploration — learning about the types of opportunities compatible with your talents, work style, and lifestyle
- Job Searching — finding and landing specific opportunities
ADP's counselors are here to work individually with you on both.

**PROFESSIONAL DEVELOPMENT PROGRAMMING**
ADP sponsors programs for LL.M. students throughout the year on topics including:
- Resume writing
- Interviewing skills
- U.S. business etiquette and networking
- Various legal practice areas[11]

31.     The Career Development page also informed Faria of various job opportunities, including the following:

**LL.M. JOB FAIRS**
Most LL.M. students are eligible to attend two job fairs specifically designed for LL.M. students: the International Student Interview Program and the UCLA [University of California Los Angeles] LL.M. Interview Program. ADP support for students attending these job fairs includes:

---

[10] "BCourses" is Berkeley's learning management system: "Instructors can create new or upload existing course materials and build graded activities within bCourses, while also using it to communicate with and provide feedback to students. It offers a variety of built-in assessment tools, as well as an opportunity to integrate external tools to customize the course experience." See https://www.ets.berkeley.edu/services-facilities/bcourses.
[11] Exhibit 3.

- Resume review, to conform your C.V. into a U.S.-style resume.
- Mock interviews, to help you develop interviewing skills through simulated job interviews conducted and evaluated by practicing attorneys.
- Individual appointments, to discuss bidding strategy and your overall plan for attending ISIP [International Student Interview Program].
- Other job opportunities. Many international employers regularly solicit resumes from students to fill their hiring needs each year.[12]

32.    Faria was also drawn to Berkeley Law because it convincingly presented itself as a cutting-edge center for international business and an incubator for business startups.

33.    Berkeley Law's website also confirmed its well-established connections to the financial services industry (including hedge funds, private equity firms, startups, and venture capitalists) and the professional firms that serve the financial industry, including major international law and accounting firms.  Among the innovative programs that attracted Faria to Berkeley Law was Startup@BerkeleyLaw, as alleged herein.

34.    Understanding and believing that Defendant and Berkeley Law had the resources, expertise, and commitment to provide him with (1) the highest quality law courses in those areas he needed to strengthen and (2) comparable quality instruction and guidance on navigating a career path, Faria submitted his application for admission to Berkeley Law's graduate LL.M. program on November 29, 2016, in which he proposed a curriculum that would and focus on "corporate, securities Law, international Law."

35.    By January 2017, Faria had not yet decided which law school he would choose. While considering his options, he received an email on January 13, 2017, from Deborah S. Schlosberg, Esq., the Director of Berkeley Law Student Advising Department, which emphasized how an LL.M. from Berkeley Law would advance his career. Director Schlosberg explained:

> "[W]e know that career progression is a priority. In the global legal marketplace, the LL.M. degree can be a critical component of career advancement in many countries worldwide. The Master of Laws degree from Berkeley Law often leads to opportunities for our LL.M. students at leading law firms around the world, as well as advancement in government bodies and institutions.[13]

---

[12] Id.
[13] A true and correct copy of the Jan. 13, 2017, email from Director Schlosberg to Faria is attached hereto an incorporated by reference as Exhibit 4.

*Faria v. The Regents*, Case No.
Complaint for Damages - 9

1

## FARIA ENTERS INTO AGREEMENT WITH REGENTS AND U.C.

2     36.    For the reasons stated above, Faria accepted Berkeley Law's admission offer in

3    April 2017 for the 2017-2018 academic year and paid $1,000 as his admission deposit.

4     37.    By accepting Faria as a student, and by Faria paying the required admission

5    deposit, Faria entered into an agreement with Defendant through UC Berkeley and Berkeley

6    Law. The terms and conditions of the agreement arise out of the representations made by

7    Defendant to Faria through Berkeley Law and U.C. websites and other communications to Faria,

8    including those representations alleged, and interpreted using the rules for interpreting

9    agreements, as codified in Civil Code §§1635 and 1663.

10     38.    Before Faria began his studies in August 2017, he knew and understood the

11    probabilities of getting any job after completing his LL.M. were slim, since Berkeley Law had

12    repeatedly advised him that less than 10 percent of its LL.M. graduates find *any* temporary or

13    permanent employment in the U.S. Specifically, in her January 13, 2017, email Director

14    Schlosberg told Faria: "As you may know, the U.S. job market for foreign-trained LL.M.

15    students is highly competitive. The number of positions for LL.M. graduates seeking a one-year

16    position during the Optional Practical Training period are limited…Legal employers rarely hire

17    LL.M. students for positions here in the U.S."[14]

18     39.    Upon his enrollment, Defendant provided Faria its LL.M. Guide for Career

19    Searches the University of California, Berkeley, School of Law 2017-2018 (LL.M. Guide).[15] The

20    LL.M. Guide told Faria "the U.S. legal job market" is "extremely tough, and not just for LL.M.

21    students. J.D. students face a difficult job market as well. Less than 10% of the LL.M. class finds

22    a job, temporary or permanent, in the U.S. following graduation."[16]

23     40.    Through the LL.M. Guide, Defendant told Faria of three other hurdles he would

24    have to overcome to work in the U.S. as an attorney:

25        A.  improve his English language skills since he was non-native speaker of English;

26        B.  pass a bar exam so he could be licensed to practice law; and

27

28

[14] *Id.*

[15] A true and correct copy of the LL.M. Guide for Career Searches the University of California, Berkeley, School of Law 2017-2018 is attached hereto an incorporated by reference as Exhibit 5.

[16] *Id.* at 3.

C.  find employment in his field of study through the firm recruitment process.[17]

41.     For its part, Defendant, through Berkeley ADP Office gave its commitment to support its LL.M. candidates overcome these obstacles: "Despite the odds, however, the Advanced Degree Programs Office is committed to supporting our students in their career advancement objectives."[18]

42.     Driven by his love for the law and resolve to master his practice area, Faria put himself on a path to overcome the long odds, obstacles and challenges to achieving his career goals.

43.     To that end, before the LL.M. academic year began, Faria enrolled in the summer session at U.C. Berkeley to study the English language, so he could better understand the course materials and improve his communication skills before he began the fall semester in LL.M. program at Berkeley Law

44.     Over the academic year, Faria threw himself into his studies to master the courses he would need to pursue his career goals. By the end of the academic year, Faria had distinguished himself, as Berkeley Law Associate Dean and Professor Mark P. Gergen confirmed in his glowing two-page review of Faria's work ethic and performance at Berkeley Law:

> Let me cut to the quick. Based on his performance in Partnership Tax I believe Faria has the analytical ability, work ethic, and lingual talent to be one of the best international tax lawyers of his generation. Partnership Tax is an extraordinarily difficult class with stiff competition. I teach it at a very high level. Faria received the fourth highest grade in a class of 10 students, tying with another student. Foreign LLM [sic] students rarely take any U.S. tax courses, much less Partnership Tax. Faria's performance in the class is the best performance of any foreign LLM [sic] student in a U.S. tax course that I have taught. …

> Faria's answer was extraordinary on each of the dimensions I just described. When he was done [sic] I literally applauded him and said how impressed I was by his answer.[19]

---

[17] *Id.*
[18] Ex. 4.
[19] A true and correct copy of Dean Gergen's Aug. 30, 2018, letter to Ernst & Young, f is attached hereto and incorporated by reference as Exhibit 6.

45.     Faria's "analytical ability, work ethic, and lingual talent," as described by Dean Gergen, also impressed the hiring partners of Ernst & Young, one of the world's Big Four accounting firms when they interviewed Faria for a job with the company in April 2018.

46.     By June 8, 2018, Faria had overcome the long odds and his biggest obstacle by successfully completing his LL.M. studies with High Honors in International Tax Law and landing a job with Ernst & Young at its headquarters in New York City as a Senior Advisor in Ernst & Young's International Tax Services Practice, at an annual base salary of $120,000.[20]

47.     Ernst & Young's job offer to Faria was only the starting point for a career with this elite firm, as the Ernst & Young hiring partner made clear with these statements in the offer:

> During the interview process you impressed us with your professional experience and qualifications. We are equally convinced that you have the ability to grow and thrive in our inclusive and supportive environment in which your unique talents and contributions will be recognized and valued…

> As you make this important decision, please keep in mind that EY is committed to fostering a professional environment where your career may flourish. Our learning culture will provide support for your development with mentoring, coaching and educational opportunities, both formal and informal. We'll also strive to provide the flexibility you need as you learn to balance work and personal life. Please read all of the attached information, and if the terms of our offer are acceptable to you, please sign where indicated. We look forward to hearing from you…[21]

> In addition to your base pay, you will have the opportunity, under EY's variable pay program, to be recognized for contributions that go above and beyond our everyday high expectations. The firm's variable pay program currently includes recognition awards, promotion bonuses and, at the rank of Senior and above, participation in the firm's performance based [sic] bonus program.[22]

48.     Faria was also well on his way to clearing one other hurdle to practice law in the U.S.: obtaining a license to practice law by the state of New York, where he would be working for Ernst & Young. By June 2018, he had completed all required courses, the necessary pro bono legal services, and submitted all required forms to take the New York bar examination. Faria

---

[20] A true and correct copy of Ernst & Young's June 8, 2018, job offer to Faria is attached hereto and incorporated by reference as Exhibit 7.
[21] *Id.*, at 1.
[22] *Id.*, at 2.

expected to take the New York bar exam in February 2019.

49.    With his LL.M. from Berkeley Law in hand, his dream job with Ernst & Young, and the bar exam on track for February 2019, Faria's career had resumed its ascent to a higher plane.

50.    Regarding a start date, Ernst & Young's letter stated, "We anticipate having you start on 6 August 2018; however, should you need to start on a different date we will try to be flexible regarding a mutually agreed upon date."[23]

51.    In anticipation of his August start date, Faria leased an apartment in New York City and purchased appropriate furniture, furnishings and appliances.

52.    By July 2018, only one minor administrative step could delay Faria from starting his new career with Ernst & Young in August 2018: The U.S. Citizenship and Immigration Services (USCIS) would have to authorize his continued stay in the U.S. by providing him with an Employment Authorization Document (EAD) so he could complete his Optional Practical Training (OPT).

53.    Under USCIS regulations, international students who have completed at least two semesters as fulltime students holding an F-1 visa, such as Faria, are eligible to work in the U.S. in their field of study for a period of twelve months through a program known as Optional Practical Training (OPT).[24] OPT is a temporary period of employment following graduation that is directly related to the major area of study of an international student with an F-1 visa. To participate in OPT, eligible students need to apply to USCIS for an Employment Authorization Document (EAD).

54.    Pursuant to applicable federal regulations, U.C. Berkeley is a certified school under the Student and Exchange Visitor Program (SEVP), which certification authorizes an academic institution to accept an international student with an F-1 visa. Berkeley Law has the same status.

55.    Among other reasons, SEVP-certified institutions are attractive to international students like Faria because F-1 students who graduate from an SEVP-certified institution like

---

[23] *Id.*
[24] *See*: https://www.uscis.gov/opt.

*Faria v. The Regents*, Case No.
Complaint for Damages - 13

U.C. Berkeley and Berkeley Law are eligible to participate in OPT.

56.    One key reason Faria chose Berkeley Law for his studies in the LL.M. program was the availability of OPT after he graduated.

57.    Applying for and obtaining an EAD to participate in OPT is typically a formality for an international student who graduates from an SEVP-certified institution and obtains a job offer in the United States, because all SEVP-certified institutions, including U.C. Berkeley, are required to employ an authorized Designated School Official ("DSO"), an "employed member of the school administration whose office is located at the school" and who is dedicated to assisting international students with F-1 visas maintain their visa status and apply for OPT. (*See* 8 C.F.R. § 214.2(f)(11).)

58.    Federal statutes, as implemented by federal regulations, required the DSO for the U.C. Berkeley Campus to accurately maintain the EAD applicant's records on the Student and Exchange Visitor Information System ("SEVIS"), the program by which the Immigration and Customs Enforcement (USICE) monitors the students with F-1 visa status who, like Faria, attend a school in the United States.[25] Federal statutes as implemented by federal regulations also require Berkeley's DSO to immediately report any error regarding the student's status to USICE upon its discovery.

59.     The Federal Regulations governing the EAD application process mandate that (A) the student applying for an EAD must personally submit the required documentation to USCIS and (B) U.C. Berkeley, through its DSO, must submit documentation on behalf of the student applying for an EAD to USCIS through SEVIS.

60.    In particular, for eligible students to obtain an EAD that allows them to participate in OPT, U.C. Berkeley and other SEVP-certified institutions must issue the student a I-20 Certificate of Eligibility and enter it on SEVIS. The I-20 Certificate of Eligibility informs USCIS that the student is in good academic standing and either already has graduated from the SEVP-certified institution or is scheduled to do so in the near future.

/ / /

---

[25] https://studyinthestates.dhs.gov/maintaining-accurate-sevis-records.

61.     The timeline for the EAD application process is set forth in 8 C.F.R.§ 214.2 (f) (11)-(12) ("Section 214.2").

62.     Section 214.2 provides that the EAD Application must be submitted no more than 90 days prior to a student's graduation and no more than 60 days after the student's graduation.

63.     The student must file the EAD Application with USCIS within 30 days of the date the DSO requests the I-20 Certificate of Eligibility online through SEVIS.

64.     The EAD application process is initiated when the student-applicant fills out an OPT Request Form with the assistance of the DSO at the student-applicant's SEVP-certified institution.

65.     Following the student's completion of the OPT Request Form, the DSO provides the student with the forms that comprise the EAD Application, including the completed I-20 Certificate of Eligibility  on which the DSO certifies the window of time and deadline for the student to submit his EAD Application to USCIS. At the same time, the DSO enters the institution's recommendation on SEVIS, which triggers the running of the 30-day time period for the student to file the EAD Application with USCIS.

66.     As alleged more specifically below, Defendant instructed Faria through his I-20 Certificate of Eligibility, which it prepared and delivered to Faria, and its Tutorial, which it instructed Faria to read and to follow, that his 30-day window of time to file his EAD Application with USCIS began to run on April 9, 2018, with a deadline of May 9, 2018, but Defendant in fact triggered the running of the 30-day period on April 6, 2018 and set the deadline for May 6, when U.C.'s DSO made her recommendation on SEVIS. In effect, Defendant and its DSO told USCIS through SEVIS that Faria had a deadline of May 6, 2018, to file his EAD Application with USCIS, but instructed Faria with the I-20 Certificate of Eligibility and by email that it had set May 9, 2018, as the deadline.

67.     For his part, Faria understood USCIS's approval of his EAD Application was a formality, which it normally is, because Defendant had repeatedly informed him that BIO staff were experts on the procedures for obtaining visas to study and authorizations to work in the U.S., that BIO would prepare the necessary forms for him to obtain his EAD to remain in the

U.S. for OPT, and that Plaintiff should follow BIO's instructions.

68. In particular, Defendant informed Faria that BIO would prepare the required I-20 Certificate of Eligibility for Faria to file with USCIS and Defendant through BIO would monitor the process until USCIS granted the EAD for Faria's OPT job, as Defendant had done for thousands of students before him.

69. Faria had learned firsthand that he could rely on Defendant and BIO to provide accurate guidance what steps should be taken to obtain a visa to enter and remain in the U.S. for educational purposes. One year earlier, in its April 19, 2017, email, when Defendant confirmed Faria's enrollment, it instructed him exactly what steps he should take to obtain his student visa and to contact BIO if he had any questions or problems with the process. In relevant part, Berkeley Law instructed Faria:

> The first step toward obtaining your student visa is completing the Non-Immigrant Information Form, or NIF. In a few days, your Non-Immigrant Information Form will be available on CalCentral. Check CalCentral to access and complete the NIF. If you have questions about the NIF, please review some basic information about the visa process at the Berkeley International Office New Students website. The visa application process can take 3-4 months, so we urge you to take action as soon as possible. If you have questions or problems completing the NIF, please contact nif@berkeley.edu.[26]

70. Following Defendant's guidelines quoted in paragraph 60, Faria completed his Non-Immigrant Information Form (NIF) and thus, with BIO's guidance, started the process that culminated with his submitting the required documentation to the U.S. embassy in Sao Paulo on approximately May 9, 2017. As a routine matter, the U.S. Department of State granted Faria's F-1 visa on approximately May 16, 2017.

71. Faria understood he would need USCIS to issue an EAD if he were to remain in the U.S. to work after he completed his LL.M. program. On this point, Defendant, through Berkeley Law's website, informed Faria and other LL.M. applicants of the existence of visa regulations and instructed them to contact BIO in this frequently asked question and answer:

/ / /

---

[26] A true and correct copy of the Berkeley Advanced Degree Program's email of April 19, 2017, is attached hereto and incorporated by reference as Exhibit 8.

**Are there visa regulations to stay in the U.S. for Optional Practical Training?**

Yes. Be aware of visa regulations for Academic Training and Optional Practical Training. Admitted students, current students and alumni may contact UC Berkeley International Office to learn more about their ability to work in the United States.

72.     Regarding the process to obtain an EAD, Defendant advised Faria in its LL.M. Student Handbook (Handbook) that BIO staff were experts in navigating the OPT process and told Faria he should follow BIO's instructions. Among other things, Defendant told Faria:

Berkeley International Office provides knowledge and expertise in advising, immigration services, advocacy, and programming to the UC Berkeley campus community. The BIO office is your primary point of contact for questions regarding your visa status; ADP staff are not permitted to provide visa or immigration advice.

Services provided by BIO:

- Advising support for nonimmigrant students
- Visa document production for nonimmigrant students and scholars
- A wide variety of programs and workshops
- OPT forms[27]

73.     The Handbook provided Faria with a link to the BIO website containing detailed information about OPT: what it is, how to apply, etc.[28] One of the links in that website provided a tutorial (Tutorial)[29] that explained in detail each step Faria had to take to obtain his EAD so he could take advantage of OPT and legally remain and work in the U.S.

74.     The Tutorial directed Faria to complete the Optional Practical Training Request Form prepared by Defendant and submit the completed form to BIO. Within three days, BIO would provide Faria with an I-20 Certificate of Eligibility for Non-Immigrant Student Status (I-20 Certificate of Eligibility).[30]

---

[27] See LL.M. Student Handbook at 10. A true and correct copy of the LL.M. Student Handbook Faria received upon his enrollment is attached hereto and incorporated by reference as Exhibit 10.
[28] See Ex. 10 at 15.
[29] A true and correct copy of the OPT Tutorial linked to BIO's March 28, 2018, email is attached hereto and incorporated by reference as Exhibit 11.
[30] A true and correct copy of the OPT I-20 Defendant provided to Faria is attached hereto and incorporated by reference as Exhibit 12.

75.     Defendant's Tutorial further instructed Faria to submit the I-20 Certificate of Eligibility along with the required forms, supporting documents and fees (EAD Application) to USCIS.

76.     Defendant's Tutorial also instructed Faria to submit his EAD Application to USCIS during a 30-day window of time which Defendant through BIO set in the I-20 Certificate of Eligibility.

77.     In order to qualify for the I-20 Certificate of Eligibility, Faria had to complete the LL.M. program for which he paid Defendant more than $60,000 in tuition and fees. Additionally, to obtain the I-20 Certificate of Eligibility, Faria had to pay Defendant $100 as a "Post-Completion Services fee."[31]

78.     At all times, based on the totality of circumstances, Defendant through BIO knew that Faria reasonably understood they would correctly, accurately, and clearly set the window of time during which Faria could timely file his EAD Application with USCIS. At all times, Defendant and BIO knew and understood that USCIS would without exception deny Faria's application if his EAD Application were untimely filed.

79.     Defendant and BIO further knew and understood that USCIS's denial of Faria's application would result in his deportation, possible arrest, loss of his job, and USCIS treating Faria as a common criminal with long term, irreversible, and adverse effects on his promising career.

80.     For this consideration, among other things, Defendant agreed through the totality of its communications with Faria through all of its sub-entities that (A) BIO would provide Faria with the I-20 Certificate of Eligibility that correctly set the 30-day window of time during which Faria could timely file his EAD Application, which included his I-20 Certificate of Eligibility, with USCIS and (B) BIO would notify USCIS of the same window of time for Faria to timely file his EAD Application with USCIS.

81.     On April 4, 2018, in accordance with Defendant's Tutorial, Faria submitted to BIO his OPT Request Form and check for $100, and thereby accepted Defendant's offer as

---

[31] Ex. 11, at 7.

specified on paragraph 68.[32] Defendant confirmed Faria's acceptance of its offer by receiving his application and accepting the $100 in funds.

82.     At all times, federal statutes, as implemented in regulations, required that Defendant correctly state all information in the I-20 Certificate of Eligibility.

### DEFENDANT BREACHES ITS AGREEMENT WITH FARIA

83.     Defendant, through BIO, breached its agreement with Faria by setting an erroneous window of time in the I-20 Certificate of Eligibility for Faria to file his EAD Application with USCIS. As alleged more specifically below, Defendant, through BIO, erroneously set the window of time as the period from April 9, 2018, through May 9, 2018, in Faria's I-20 Certificate of Eligibility.

84.     Defendant, through BIO's email to Faria of April 9, 2018, again confirmed the erroneous deadline of May 9, 2018, for the filing of his EAD Application with USCIS.[33] The email directed Faria to look at the section titled "Program of Study on your I-20," which indicated May 9, 2018, as the date on which his "Program of Study ended."

85.     Defendant admitted making the error through the letter the Director of BIO, Ivor Emmanuel, sent to Ernst & Young on approximately August 30, 2018. In particular, Defendant, through Director Emmanuel's letter of August 30, 2018, (1) admitted that BIO had incorrectly stated the window of time for Faria to file his EAD Application in the I-20 Certificate of Eligibility BIO prepared and provided to Faria and (2) conceded that, as a consequence, Faria's EAD application was denied. On these points, Director Emmanuel's letter stated:

> This letter is written in support of Henrique Lavalle who has a current job offer from EY. Henrique is a recent LLM [sic] graduate of the University of California, Berkeley Boalt School of Law. As an F-1 nonimmigrant international student, Henrique recently sought Optional Practical Training (OPT) employment authorization through the USCIS that would permit him to join your organization. Unfortunately, an erroneous slide on a powerpoint [sic] presentation providing instructions to students on how to complete the application contributed to the

---

[32] A true and correct copy of Faria's OPT Request Form is attached hereto and incorporated by reference as Exhibit 13.

[33] A true and correct copy of BIO's April 9, 2018, email to Faria is attached hereto and incorporated by reference as Exhibit 14.

denial of Henrique's application for OPT. We deeply regret this error and are taking several steps to assist Henrique in this very unfortunate situation.[34]

86.    In a second letter dated August 31, 2018, to USCIS, Director Emmanuel explained Defendant's and BIO's error more precisely:

> Henrique was following the guidelines provided by the Berkeley International Office. On page 16 of the instructional materials (OPT Tutorial Powerpoint [sic] presentation - attached) a box with instructions erroneously pointed to the date on page two of the I 20 as the deadline date by which students needed to have their completed application at USCIS.[35]

87.    In the paragraph quoted above, Director Emmanuel was referring to the following instruction and illustration at page 16 of the Tutorial, which identifies the page of and line number of the I-20 Certificate of Eligibility that sets the last day of the 30-day window during which Faria could timely file his EAD Application with USCIS:



88.    On the same line of the same page of Faria's I-20 Certificate of Eligibility, Defendant through BIO set the date April 9, 2018, as the first day of the 30-day period during which Faria could file his EAD Application and thereby set May 9, 2018, as the deadline for filing it with USCIS. BIO delivered the I-20 Certificate of Eligibility with the relevant portion exactly as shown below:



---

[34] A true and correct copy of Director Emmanuel's letter of Aug. 30, 2018, to Ernst & Young is attached hereto and incorporated by reference as Exhibit 15.

[35] A true and correct copy of Director Emmanuel's letter of Aug. 31, 2018, to USCIS is attached hereto and incorporated by reference as Exhibit 16.

*Faria v. The Regents*, Case No.
Complaint for Damages - 20

89.     In the same letter, Ex. 16, Director Emmanuel then explained this was the wrong date: "In fact, the date that should have been used was the issue date on page l of the I 20."[36]

90.     In the same letter, Ex. 16, Director Emmanuel admitted in the following statement that Defendant's and BIO's error caused the USCIS to deny Faria's EAD Application:

> As a result of this error, and because the date on page 2 of the form I 20 was different from the date on page 1 by three days, Henrique submitted his application which arrived at USCIS 3 days after the stated deadline. We deeply regret this error and appeal to you to reopen the case given that he was otherwise eligible at the time of filing the initial application. He mailed out the application on May 4th and it was technically due on May 6th. It was receipted [sic] on May 8th (Receipt # YSC 1890222817).[37]

91.     In the same letter, Ex. 16, Director Emmanuel then explains the impact the denial will have on Faria's career:

> This administrative error that was contributed by my office, will result in considerable hardship for Henrique as he will miss a tremendous opportunity to work for one of the world's renowned accounting firms—Ernst and Young (EY).[38]

92.     Director Emmanuel correctly predicted Defendant's breach of its agreement with Faria would result in the loss of "tremendous opportunity," i.e., a career with Ernst & Young, "one of the world's renowned accounting firms," but Defendant's blunder would cause far more damage and harm. As a direct result of Defendant's breach of its agreement with Faria,  he lost the opportunity to use his year with Ernst & Young as a stepping stone for a lateral move to other international law and accounting firms or to the international companies which hire executives and professionals from accounting firms such as Ernst & Young after they have gained critical work experience.

93.     Faria also lost his opportunity to take the New York State bar examination in February 2019, because he lacked the funds to return to the U.S., reside in the U.S., pay for a bar exam review course, reside in the U,S. while he took the review course, and take the New York bar exam in February 2019.

---

[36] *Id.*
[37] *Id.*
[38] *Id.*

94.    When Faria learned on August 20, 2018, that USCIS had denied his EAD Application, he immediately informed Mimi Ghosh—the International Scholar and Student Advisor at BIO he had been referred to in the past—by email and requested help: "Dear Mimi, I just checked and as you can see from the attached picture, my request was denied. What should I do? What's my option? I start my job on 09.10.18. Do I have enough time to appeal? Please help me."[39]

95.    On the same day, August 20, Ghosh responded to Faria but offered no suggestions, options or guidance how Faria could avoid or mitigate the loss of his job and the loss of his visa status. Instead, Ghosh, on behalf of BIO and Defendant, told Faria he had no options and had to leave the country with these words:

> The 30 days start from the date we issued the I-20, on p. 1, and that was April 6.
> I realize this must be a very unwelcome shock. Unfortunately, as your program ended on May 9, your 60-day grace period is over, so to lessen the negative impact to your immigration record, you will need to depart the U.S. as soon as possible.[40]

96.    On September 7, 2018, Faria again informed BIO he had exhausted all his funds and would soon lose his job. He requested BIO's and Defendant's assistance, including legal assistance, through Director Emmanuel. Faria's email in part read:

> I think you should talk to your legal team to figure out a way to help me because I am in a necessity here. I already took 2 students [sic] loans to pay the tuition and moving expenses to NY and also money from friends. I dont [sic] have anyone else to ask.[41]

97.    Director Emmanuel responded the next day, September 8, 2018:

> I understand your situation Henrique. Unfortunately, we do not have the resources to support you any further. I am sorry that I am unable to assist you financially. I advise you to look at options that are least costly to you including going home and waiting for any further decisions.[42]

---

[39] A true and correct copy of the email chain between Faria and Ms. Ghosh is attached hereto and incorporated by reference as Exhibit 17; see page 3, email at 7:55 AM.
[40] *Id.*, at 2, email at 8:45 PM.
[41] A true and correct copy of the email chain between Faria and Director Emmanuel is attached hereto and incorporated by reference as Exhibit 18; see page 1, email sent at 5:01 PM.
[42] *Id.*, at 1, email at 6:36 PM.

98.     Defendant thereby refused to provide Faria with any assistance, legal or any other, to prevent or mitigate the damage it was causing him despite its statements and representations that it had trained staff to assist Faria, including two skilled attorneys dedicated to the LL.M. program, as alleged above.

99.     Defendant also refused to accept any responsibility for breaching its agreement or directing Faria to follow BIO's instructions and accept and use the OPT 1-20 as prepared by BIO with its erroneous window for filing his OPT Application with USCIS.

100.    In addition to the other harm and damages alleged above, Faria accumulated more than $48,000 in debt to pay for his living expenses in Berkeley and his job-related expenses in New York.

## DEFENDANT REWRITES ITS AGREEMENT WITH U.C. FOREIGN STUDENTS TO ELIMINATE LIABILITY FOR SIMILAR FUTURE BLUNDERS

101.    Defendant through Berkeley Law and BIO has impliedly admitted its liability for breaching its agreement with Faria by rewriting and modifying the documents on the Berkeley Law and BIO websites that are incorporated into that agreement, so Defendant would have no contractual liability to any future foreign student at U.C. Berkeley for conduct similar to Defendant's conduct alleged herein.

102.    To that end, Defendant has rewritten the OPT Request Form on BIO's website. When Faria submitted the form to BIO, it required him to agree to this statement: "I understand the responsibilities required for maintaining F-l status during my period of OPT authorization as stated on the reverse and in the OPT Application Guide. (http://internationaloffice.berkeley.edu/students/training/f-1/opt)."[43]

103.    After Faria's counsel contacted Defendant regarding its mishandling of Faria's I-20 Certificate of Eligibility and by extension his EAD Application, Defendant modified the OPT Request Form so it now reads:

---

[43] Exhibit 13.

*Faria v. The Regents*, Case No.
Complaint for Damages - 23

I have fully read all slides in the OPT Tutorial:
https://internationaloffice.berkeley.edu/sties/default/files/opt-tutorial.pdf.
I understand OPT application procedures and the responsibilities required for maintaining F-1 status during my period of OPT authorization as stated in this form, in the OPT Tutorial and on the BIO OPT website:
http://internationaloffice.berkeley.edu/students/training/f-1/opt
***I understand I am solely responsible for submitting a proper & timely OPT application and for maintaining my F-1 student status during OPT*** (Emphasis added).

104.    To the same end, Defendant has also corrected the error in its Tutorial. The erroneous instruction provided to Faria by the Tutorial operative in 2018 and that Faria relied upon has been removed. In its place, Defendant has consistently stated the correct window of time and deadline for U.C. foreign students to file their EAD Application with USCIS.

105.    Further, Defendant's new tutorial offers this new warning to students at page 2:

Please note that this tutorial is for instructional purposes only. An OPT application to USCIS is <u>your own personal application</u>. You alone are responsible for timely filing with full documentation, understanding F-1 rules regarding OPT, and properly maintaining F-1 status.[44]

## <u>FIRST CAUSE OF ACTION</u>
### Breach of Express Agreement

106.    Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

107.    As alleged herein, Defendant and Faria entered into an express agreement by the terms of which Faria paid Defendant more than $60,000 in tuition and other fees to obtain an LL.M. degree at Berkeley Law and for the assistance of Berkeley Law, ADP and BIO in navigating the career options that would be available to him after he graduated with from the LL.M. program.

108.    For this consideration, among other things, Defendant agreed to provide Faria with an I-20 Certificate of Eligibility in which Defendant would accurately state (A) Faria's eligibility for an EAD and (B) the 30-day window of time and deadline for Faria to timely file

---

[44] A true and correct copy of the new OPT Tutorial is attached hereto and incorporated by reference as Exhibit 19.

his EAD Application, including his I-20 Certificate of Eligibility, with USCIS.

109.   Faria performed each and every term and covenant of the agreement he was obligated to perform, including the payment of more than$60,000 in tuition and fees to Defendant.

110.   On April 4, 2018, in accordance with Defendant's Tutorial, Faria submitted his OPT Request Form to BIO along with his check in the sum of $100, and thereby accepted Defendant's offer as specified on paragraph 68.  Defendant confirmed Faria's offer by receiving his application and accepting the $100 in funds.

111.   As alleged herein, Defendant breached its agreement with Faria preparing and delivering to him a defective I-20 Certificate of Eligibility that set May 9, 2018, as the deadline for filing his EAD Application with USCIS, while at the same time it notified USCIS that May 6, 2018, was in fact the correct deadline.

112.    Defendant's breach of said agreement caused Faria to suffer the damages and other harm alleged herein.

### SECOND CAUSE OF ACTION
### Breach of Implied Agreement

113.   Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

114.   As alleged herein, Defendant and Faria entered into an implied agreement by their terms of which Faria paid Defendant more than $60,000 for educational courses to obtain an LL.M. degree at Berkeley Law and for expert assistance in navigating career options that would be available to him after he graduated with an LL.M. degree.

115.   Defendant's breach of said agreement caused Faria to suffer the damages and other harm alleged herein.

### THIRD CAUSE OF ACTION
### Negligence

116.   Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

117.     As alleged herein, Defendant has privatized the self-supporting programs at U.C. Berkeley and other U.C. campuses, including the LL.M. program undertaken by Faria. As operated by Defendant, said self-supporting programs receive no financial support from taxpayers. Instead, they operate as cash-generating, for-profit programs similar in nature and character to other for-profit business projects undertaken by Defendant. The Government Claims Act has no application to such projects. To the extent Defendant asserts that Faria's claims alleged herein come within the scope of the Government Claims Act, Defendant has waived the protections of said Act by its conduct as alleged herein.

118.     At all times, federal statutes, as implemented in regulations, required that Defendant correctly and accurately state all information in its Tutorial and Faria's I-20 Certificate of Eligibility.

119.     As alleged herein, in the scope of their employment, Defendant's employees negligently prepared its Tutorial and Faria's I-20 Certificate of Eligibility by providing Faria with a specific window of time and deadline for him to file his EAD Application with USCIS, while simultaneously providing a different and earlier window of time and deadline to USCIS for Faria to file his EAD Application.

120.     Defendant's negligence was the proximate cause of the damages and other harm suffered by Faria, as alleged herein.

121.     Defendant's negligence was also the proximate cause of serious emotional distress suffered by Faria in that Defendant's wrongful conduct caused:

       A.  irreparable harm to his career,

       B.  the loss of his dream job,

       C.  ongoing and permanent damage to his reputation;

       D.  his humiliating arrest and detention in feet and hand cuffs;

       E.  and his police-escorted boarding flight to Brazil, as if he were an international criminal.

**FOURTH CAUSE OF ACTION**

**Negligent Misrepresentation**

122.    Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

123.    As alleged herein, Defendant's employees acting in the scope of their employment, negligently represented to Faria in its Tutorial and its I-20 Certificate of Eligibility that he had a window of time from April 9 through May 9, 2018, to file his EAD Application with USCIS, while simultaneously providing a different and earlier window of time and deadline to USCIS for Faria to do the same.

124.    At all times, Faria believed Defendant's misrepresentations to be true.

125.    Faria relied upon Defendant's negligent misrepresentations and filed his EAD Application within the window of time and by the deadline Defendant misrepresented.

126.    Defendant's negligent misrepresentation was the proximate cause of Faria's damages, including his severe emotional distress as alleged herein.

**FIFTH CAUSE OF ACTION**

**Negligent Interference with Prospective Contractual Relationships**

127.    Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

128.    Defendant's conduct, as described above, interfered with the prospective contractual relationship between Faria and Ernst & Young.

129.    Defendant, with knowledge of Faria's prospective contractual employment relationship with Ernst & Young, negligently mishandled Faria's I-20 Certificate of Eligibility and EAD Application, thus interfering with Faria's contractual relationship with Ernst & Young.

130.    Defendant's interference caused Faria to suffer the damages set forth above.

**SIXTH CAUSE OF ACTION**
**Negligence (Gov. Code 815.2)**

131.    Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

132.   At all times, federal statutes, as implemented in regulations, required that Defendant correctly and accurately state all information in its Tutorial and Faria's I-20 Certificate of Eligibility.

133.   As alleged herein, in the scope of their employment, Defendant's employees negligently prepared its Tutorial and Faria's I-20 Certificate of Eligibility by providing Faria with a specific window of time and deadline for him to file his EAD Application with USCIS, while simultaneously providing a different and earlier window of time and deadline to USCIS for Faria to file his EAD Application.

134.   Defendant's negligence was the proximate cause of the damages and other harm suffered by Faria, as alleged herein.

135.   Defendant's negligence was also the proximate cause of serious emotional distress suffered by Faria in that Defendant's wrongful conduct caused:

> F.   irreparable harm to his career,
>
> G.   the loss of his dream job,
>
> H.   ongoing and permanent damage to his reputation;
>
> I.   his humiliating arrest and detention in feet and hand cuffs;
>
> J.   and his police-escorted boarding flight to Brazil, as if he were an international criminal.

## SEVENTH CAUSE OF ACTION
### Negligent Misrepresentation (Gov. Code 815.2)

136.   Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

137.   As alleged herein, Defendant's employees acting in the scope of their employment, negligently represented to Faria in its Tutorial and its I-20 Certificate of Eligibility that he had a window of time from April 9 through May 9, 2018, to  file his EAD Application with USCIS, while simultaneously providing a different and earlier window of time and deadline to USCIS for Faria to do the same.

138.    At all times, Faria believed Defendant's misrepresentations to be true.

139.    Faria relied upon Defendant's negligent misrepresentations and filed his EAD Application within the window of time and by the deadline Defendant misrepresented.

140.    Defendant's negligent misrepresentation was the proximate cause of Faria's damages, including his severe emotional distress as alleged herein.

## EIGHTH CAUSE OF ACTION
### Negligent Interference with Prospective Contractual Relationships (Gov. Code 815.2)

141.    Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

142.    Defendant's conduct, as described above, interfered with the prospective contractual relationship between Faria and Ernst & Young.

143.    Defendant, with knowledge of Faria's prospective contractual employment relationship with Ernst & Young, negligently mishandled Faria's I-20 Certificate of Eligibility and EAD Application, thus interfering with Faria's contractual relationship with Ernst & Young.

144.    Defendant's interference caused Faria to suffer the damages set forth above.

## NINTH CAUSE OF ACTION
### Mandatory Injunction

145.    Faria incorporates by reference the factual allegations of each of the foregoing paragraphs as though fully set forth herein.

146.    In the event no adequate remedy-at-law fully compensates Faria for his losses, an injunction should be issued directing Defendants to comply with the terms of its agreement to mitigate Faria's damages, as alleged herein, to the extent possible.

## REQUEST FOR RELIEF

Faria hereby requests the following relief:

1)    Compensatory damages, including general emotional distress damages, lost wages and benefits;

2)    Back pay, front pay (rather than hiring), and general presumed and specific damages based upon damage to Faria's wage-earning capacity, career and personal reputation;

1    3)      An injunction be issued as alleged in the Sixth Cause of Action.

2    4)      Interest on judgment, including prejudgment interest, at the legal rate, pursuant to

3    Civil Code § 3291;

4    5)      Faria's costs incurred; and

5    6)      Such other and further relief as the Court may deem equitable and proper.

6                          **<u>DEMAND FOR JURY TRIAL</u>**

7    Faria hereby demands a jury trial on all issues.

9    Dated: December 23, 2019                    Gilleon Law Firm, APC

11                                               _____
                                                 Daniel M. Gilleon, Attorneys
12                                               for Plaintiff Henrique Lavalle
                                                 Da Silva Faria